<u>**NOT FOR PUBLICATION**</u>

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| UNITED STATES OF AMERICA, | Crim. Action No. 20-72 (SDW) |
| v. | **OPINION** |
| RODNEY JOYNER, | October 1, 2021 |
| Defendant. | |

**WIGENTON**, District Judge.

Before this Court is Defendant Rodney Joyner's ("Joyner" or "Defendant") Motion to Suppress Evidence (the "Motion") pursuant to Federal Rule of Criminal Procedure 12(b)(3)(C). For the reasons discussed below, the Motion is **GRANTED**.

**I.      FACTUAL AND PROCEDURAL BACKGROUND**

On January 17, 2019, "a group of Jersey City police officers were conducting surveillance in the area of Orient Avenue and Martin Luther King Drive." (D.E. 22 at 2.)  That evening, after receiving two anonymous tips regarding a man with a gun, the police officers arrived at a liquor store in Jersey City where Defendant was shopping.  (*Id*.)  The police officers patted Defendant down in what they assert was a constitutional Terry stop, discovered a handgun, and arrested Defendant.  (*See generally* D.E. 23.)  Defendant is now charged with unlawful possession of a firearm in violation of 18 U.S.C. § 922(g)(1).  (D.E. 22 at 1.)

On February 28, 2020, Defendant filed this motion to suppress the evidence seized during that January 17, 2019 arrest. (*Id.* at 1.) Defendant contends that the liquor store search violated his Fourth Amendment rights because the police officers lacked a reasonable suspicion for their stop. (*See generally* D.E. 22; D.E. 26.) In addition, Defendant pointed out that the police report's timeline regarding the two tips was at best "[c]onfusing," if not implausible. (*See id.* at 3.) On March 13, 2020 the United States of America (the "Government") opposed on the basis that the anonymous tips "individually and collectively" provided sufficient grounds to stop Defendant. (D.E. 23 at 4.) This Court, writing for the parties, assumes familiarity with the history of this matter and addresses only those facts relevant to deciding the present motion.

### a. Officer Timothy O'Neill's Police Report

The police report written by Officer Timothy O'Neill describes two anonymous tips, which allegedly led the police officers to Defendant. A summary of the police report follows.

The police report states that at 9:23 P.M., four police officers from a street crime squad, including Officer O'Neill, arrived in the area of Orient Avenue and Martin Luther King Drive, to assist another street crime squad that was conducting a narcotics arrest. (*Id.* at 2; D.E. 22, Ex. A.) On the street, Officer O'Neill was approached by a tipster, who stated that a tall black man with dreadlocks and a burgundy sweatshirt had a handgun and had entered a liquor store across the street (the "Street Tip"). (D.E. 22, Ex. A.) The tipster did not provide any other information. (*Id.*) Despite a large number of police officers at the scene, none of them asked for "a name or any identifying information for the alleged tipster." (D.E. 22 at 2.) The tipster then disappeared. (D.E. 22, Ex. A.)

Officer O'Neill and at least three other officers approached the liquor store. (*Id.*) Officer O'Neill looked into the liquor store window and saw a man who matched the tipster's description.

(*Id.*; D.E. 22 at 6.)  Officer O'Neill, along with at least three other officers, entered the store and immediately conducted a pat down on the individual for weapons.  (*Id.* at 2–3.)  Officer O'Neill "felt the handle of what [he] recognized to be a handgun inside the male's front waistband," yelled "handgun," and advised the other officers of his discovery.  (D.E. 22, Ex. A.)  The suspect was placed under arrest and transported to the station.  (*Id.*)

The report also states that at 9:25 P.M., seemingly after the Street Tip, Sergeant Scarpa relayed a tip from another anonymous informant via a radio message ("Scarpa Tip").  (*Id.*; D.E. 22 at 3.)  The report is vague as to how the Scarpa Tip was communicated to the police officers, but states that "Scarpa gave a description of a tall Black man, dread locks, and black jacket" who was "armed with a handgun in the area of Orient and MLK."  (D.E. 22, Ex. A.)  The report notes that, after this tip was relayed, Officer Sanchez stated that he saw a "male, whom he recognized as Rodney Joyner," walk down the same street ("Sanchez Corroboration").  (*Id.*)  No other details about the "male" are included in the police report.  (*Id.*)

### b. Evidentiary Hearing

Given the police report's lack of clarity and incomprehensible timeline, this Court held an evidentiary hearing on July 29, 2021.  (D.E. 35 ("Tr.").)  That hearing included argument from counsel and witness testimony from Officers Timothy O'Neill[1] and Kevin Lowery.  At the evidentiary hearing, Officer O'Neill repeatedly acknowledged that the police report, which he wrote, included multiple errors.  (Tr. 19:18–23 ("I didn't put it in the report"), 23:17–24 ("[T]hat was a mistake"), 24:6–10, 79:20–80:23.)  A summary of the inconsistencies between the police report and Officer O'Neill's testimony follows.

---

[1] Since Defendant's arrest, Mr. O'Neill has been promoted from officer to detective.  For ease of reference, given his status as an officer at the time of Defendant's arrest, this opinion refers to him as "Officer O'Neill" throughout.

Officer O'Neill's testimony regarding the contents of the Scarpa Tip did largely match the contours of the police report: a "tall, black male with long dreadlocks and a black jacket in the area of Orient and Martin Luther King Drive" may be "armed with a handgun." (Tr. 15:8–13, 16:20–25, 17:21–23 (tip did not tell the Officers to go to a "particular store").) Officer O'Neill testified, however, that his police report incorrectly listed the time at which he received the Scarpa Tip, which had actually been relayed before the Street Tip occurred. (Tr. 15:8–13, 23:17–24.) Officer O'Neill also testified that the Scarpa Tip had been passed from individual to individual before making it to his squad. First, Sergeant Scarpa had received the tip from the anonymous tipster. (*See* Tr. 17:2–8, 57:6–58:17.) Officer O'Neill was unable to provide any information regarding this tipster during the hearing and acknowledged that he did not "consult with Sergeant Scarpa" when drafting the report to find out "where he got the information." (Tr. 17:9–20, 58:23–59:24 (Q: "… [Y]ou don't know anything about [the tipster], do you?" A: "No, I do not.").) Then, Sergeant Scarpa passed the tip on to Officer O'Neill's supervisor, Sergeant Cullinane. (Tr. 57:6–11.) It does not seem that Sergeant Cullinane had any information about the tipster, either. (*See* Tr. 60:8–22 (Q: "And Sergeant Cullinane doesn't know either, right, because he wasn't there?" A: "He wasn't there. … He doesn't know that, correct.").) Officer O'Neill testified that he assumed Sergeant Scarpa had given Sergeant Cullinane the Scarpa Tip over the phone. (*Id.*) Finally, Sergeant Cullinane radioed out the Scarpa Tip over a frequency that Officer O'Neill's squad had access to. (Tr. 60:18–20, 67:7–16.) This game of telephone was not described in the police report.

As to the Sanchez Corroboration, Officer O'Neill testified that he had not properly recorded all of the information that Officer Sanchez relayed over the radio in the police report. Officer O'Neill testified that, after the Scarpa Tip was radioed out, Officer Sanchez replied over the radio that he had seen Rodney Joyner, and that Mr. Joyner was a "tall, black male with a black

jacket with a red or burgundy hood" and "long dreadlocks." (Tr. 18:11–19:24.)  The police report did not clearly list any description given by Officer Sanchez, nor did it not mention anything about Officer Sanchez describing a burgundy hood.  (*See* D.E. 22, Ex. A.)  Officer O'Neill testified that Sanchez's statement amounted to little more than an acknowledgement that "Rodney Joyner was walking" in the area and fit the Scarpa Tip's broad description. (Tr. 91:1–4.)  For example, Officer Sanchez did not describe any suspicious behavior or otherwise "say that Mr. Joyner appeared to be armed." (Tr. 20:19–21.)

Third, as to the Street Tip, Officer O'Neill testified that his police report had failed to include some of the information regarding the Street Tip.  Officer O'Neill stated that the street tipster had also told him that Defendant's handgun was tucked into his waistband.  (Tr. 28:1–9, 28:4–9.)  This information was not included in the police report.  Officer O'Neill did not testify as to how, on a January night, the tipster saw the gun's location.  Officer O'Neill also testified that the tipster seemed "apprehensive," and "quiet," and "did not want to be seen" with the police officers.  (Tr. 26:16–18.)  This description was not in the police report.  Officer O'Neill also testified to the same description of the Street Tip as the police report: that an armed "tall, black male with a black jacket and a red hood and … long dreadlocks" had walked across the street and entered the liquor store.  (Tr. 25:21–26:4.)  However, Officer O'Neill was not able to provide even a vague physical description of the tipster.  When asked about the tipster's credibility, Officer O'Neill stated that he believed that the individual's "fearful[ness]" of the police supported his or her credibility.  (Tr. 29:5–14.)

Officer O'Neill testified that he then went to the liquor store, looked through the glass in the door, saw a "tall black male with long black dreads, a black jacket and a red burgundy hood with black pants," and entered the store.  (*See* Tr. 40:6–22.)  The individual was not "breaking the

law," as far as Officer O'Neill knew, but was merely "standing by the counter." (Tr. 92:18–21.) Officer O'Neill also testified that, in contradiction to the police report, he did not pat down the suspect and feel the contours of a handgun in the individual's pants. (Tr. 94:11–19.) To the contrary, "before [he] found the gun, [Defendant] told [the officer] that he had a gun." (Tr. 42:5–24.) Officer O'Neill testified that he was "going to pat [Defendant] down" when Defendant stated, "Yeah, I got it on me," at which point Officer O'Neill "retrieved the handgun from his waistband." (Tr. 42:7–18.) This description is not in the police report.

Video footage of the police officers entering the liquor store was also admitted into evidence during the evidentiary hearing. In the relevant video, as the police officers entered the store, one of Officer O'Neill's colleagues grabbed a "man walking out of the store" and "patted him down." (Tr. 86:16–22.) Officer O'Neill stated he was not sure what that man had done to provide the police officers reasonable suspicion for this pat down. (Tr. 87:25–88:1.) The police report did not mention or describe this other Terry stop. (Tr. 42:5–15.)

Defendant was then taken to the station, where he was interviewed by Officer Lowery. (Tr. 101 16, 104:20-105:13.) Defendant was given a "rights and waiver statement," and some parts of that document were read to him before he was directed to "initial the form." (Tr. 107:13–108:13.) The Government acknowledges that Defendant "asked for an attorney." (Tr. 113:13–18.) However, the Government argues that "within the same breath" of his request for an attorney, (Tr. 117:12–15), Defendant stated that the police had "caught [him] with a gun," (Tr. 118:16–23). At the evidentiary hearing, the parties seem to have agreed upon a stipulation wherein all questions asked after Defendant's "same breath" statement are to be excluded. (Tr. 4:5–6:1.)

## II.   DISCUSSION

### A.  Applicable Law

"The Fourth Amendment protects the right to be free from 'unreasonable searches and seizures.'" *United States v. Sangster*, Crim. No. 19-3273, 2021 WL 2974635, at *2 (3d Cir. July 15, 2021); U.S. Const. amend. IV.  "Warrantless searches and seizures are presumptively unreasonable and are therefore prohibited under the Fourth Amendment, unless an exception applies." *United States v. Hester*, 910 F.3d 78, 84 (3d Cir. 2018) (citation omitted).  In *Terry v. Ohio*, "the Supreme Court set forth an exception that allows a police officer to conduct a 'brief, investigatory stop when the officer has a reasonable, articulable suspicion that criminal activity is afoot.'" *United States v. Scott*, 816 F. App'x 732, 736 (3d Cir. 2020) (citing *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000)); *see also Terry v. Ohio*, 392 U.S. 1, 1 (1968).  "Because this reasonable suspicion requirement is only triggered by a seizure, we first pinpoint the moment of the seizure and then determine whether that seizure was justified by reasonable, articulable facts known to [the officer] as of that time that indicated that [the suspect] was engaged in criminal activity. *United States v. Scott*, 816 F. App'x 732, 736 (3d Cir. 2020) (internal citations and quotations omitted).

A seizure occurs when a police officer has restrained a person's liberty through physical force or a show of authority.  *United States v. Crandell*, 554 F.3d 79, 84 (3d Cir. 2009) (quoting *Terry*, 392 U.S. at 19-20, n. 16); *see Brendlin v. California*, 551 U.S. 249, 256 (2007) (quoting *United States v. Mendenhall*, 446 U.S. 544, 545 (1980)).  Officer O'Neill seized Defendant when he entered the liquor store and immediately alerted him that he would need to pat Defendant down for an investigation.  (*See* D.E. 22, Ex. A); *see also United States v. Brown*, 448 F.3d 239, 246 (3d Cir. 2006).  Therefore, for the seizure to have been appropriate, the Terry stop must have been based upon a reasonable, articulable suspicion.  If the officers acted without an appropriate basis

for their stop, the evidence obtained pursuant to that unconstitutional seizure must be suppressed. *See Brown*, 448 F.3d at 244.

Courts apply a "totality of the circumstances" test to assess whether an officer had a "particularized and objective basis" for suspecting wrongdoing, and account for trained officers' commonsense judgments and inferences about human behavior. *United States v. Arvizu*, 534 U.S. 266, 273 (2002) (quoting *United States v. Cortez*, 449 U.S. 411, 417–18 (1981)). That officer's determination of reasonable suspicion receives "significant deference." *United States v. Michael Torres*, 961 F.3d 618, 623 (3d Cir. 2020) (citation omitted); *United States v. Foster*, 891 F.3d 93, 104 (3d Cir. 2018). A reasonable, trained officer, however, must be capable of specifying the reasons that justify the suspect's seizure. *See United States v. McCants*, 952 F.3d 416, 422 (3d Cir. 2020) (alterations in original) (quoting *Brown*, 448 F.3d at 246–47)). In *United States v. Johnny Torres*, the Third Circuit identified factors that could potentially reflect the reliability of an anonymous tip, including whether: the officer "had an opportunity to appraise the witness's credibility through observations," the "person providing the tip can be held responsible if her allegations turn out to be fabricated," the "content of the tip is not information that would be available to any observer," the person "providing the information has recently witnessed the alleged criminal activity," or the tip "predicts what will follow" in a way that "provides police the means to test the informant's knowledge or credibility." *Johnny Torres*, 534 F.3d 207, 211 (3d Cir. 2008) (citing *Brown,* 448 F.3d at 249–50).

### B. Analysis

The Government has the initial burden to prove that a Terry stop is based on reasonable suspicion. *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000). The Government argues that the two tips amount to a "reasonable suspicion" on which the police officers relied to "conduct a Terry

stop and frisk of the defendant on January 17, 2019." [2]  (Tr. 6:15–7:4.)  Defendant contends that,

even in combination, the anonymous tips were an insufficient basis for a search.  (*See* D.E.22; D.E.

26.)  Reasonable suspicion is an "elusive concept," but requires that "the detaining officers must

have a particularized and objective basis for suspecting the particular person stopped of criminal

activity."  *United States v. Cortez*, 449 U.S. 411, 417–18 (1981).  It "requires that the officer

articulate something more than an inchoate and unparticularized suspicion or hunch."  *Madsen v.*

*Washington Twp. Police*, Civ. No. 20-2395, 2021 WL 3932056, at *4 (D.N.J. Sept. 2, 2021)

(internal quotations omitted) (citing *United States v. Sokolow*, 490 U.S. 1, 7 (1989)).

  "'Tipster' cases, whether involving probable cause or reasonable suspicion determinations,

focus on the tip's indicia of reliability."  *United States v. Henley*, 941 F.3d 646, 654 (3d Cir. 2019).

"[A]n anonymous tip alone seldom demonstrates the informant's basis of knowledge or veracity

inasmuch as ordinary citizens generally do not provide extensive recitations of the basis of their

everyday observations and given that the veracity of persons supplying anonymous tips is by

hypothesis largely unknown, and unknowable."  *Alabama v. White*, 496 U.S. 325, 329 (1990).

Anonymous tips, which are inherently unreliable, must contain "something more" before

reasonable suspicion arises.  *Id*.  A "truly anonymous" tip may meet this standard if the tip includes

predictive future facts and the police officers observe illegal or unusual conduct that corroborates

the tip by suggesting "that criminal activity may be afoot."  *Id*. at 332; *see also Florida v. J.L.*, 529

U.S. 266, 272 (2000); *Terry v. Ohio*, 392 U.S. 1, 16 (1968).

  Here, the Scarpa Tip's content and context failed to provide any indicia of reliability that

would suggest the police officers acted on a reasonable suspicion.  The content of the tip was

---

[2] Again, "this Court faces the 'difficult task of considering a hodgepodge of inconsistent information,' and untangling the Government's various narratives."  *United States v. Brantley*, Crim. No. 19-92, 2021 WL 1921584, at *4 (D.N.J. May 13, 2021) (citing *United States v. Slaughter*, Crim. No. 03-43, 2005 WL 8165165, at *1 (M.D. Pa. Jun. 10, 2005)).

entirely unremarkable and lacked any information with predictive value.  *See Florida*, 529 U.S. at 272 (2000).  Officer O'Neill himself acknowledged that there was "nothing about" the description "that [wa]s very unusual for this location" in Jersey City.  (Tr. 62:2–5.)  The "neighborhood [wa]s predominately African American" with a "lot of black men in the area."  (Tr. 61 10–16.)  Further, "[d]reads" and "braids" were "not very unusual."  (Tr. 61:17–62:1.)  Thus, the Scarpa Tip alone, without reliable corroboration, could not provide the police officers with a reasonable suspicion for a stop and frisk.

The Government's brief includes a lengthy argument regarding rules related to disclosing a confidential informant's identity.  (D.E. 23 at 15.)  This tangent, however, misconstrues the point.  The Government did not need to disclose their confidential informant's identity in order to present evidence regarding the reliability of their informant.  There is simply no evidence in the record that the tipster was a reliable informant whose identity was actually known to Sergeant Scarpa.  Although the Government vaguely suggests that the tipster was "known to law enforcement"[3] in briefing, (*see* D.E. 23 at 13), it has never provided testimony to this effect, (*see*, *e.g.*, Tr. 17:17–20).  The Government had the opportunity, at an evidentiary hearing, to present Sergeant Scarpa or Sergeant Cullinane, who could have confirmed the existence of a reliable or known informant without compromising that individual's identity.  *See Florida*, 529 U.S. at 275 (Kennedy, J., concurring) (a truly anonymous tipster is distinguishable from an informant who has a proven track record of providing reliable information).  The Government chose, however, to present only Officer O'Neill.

---

[3] It is far from clear whether this Court was intended to interpret "known to law enforcement" as meaning that Sergeant Scarpa had spoken to the tipster once, or whether it was intended to suggest the tipster was a reliable, repeat informant whose information had previously borne out to be true.  (*See* D.E. 23 at 13.)  It is the Government's burden to present evidence that its tipster is known to law enforcement and reliable, and not this Court's role to divine tipster reliability from obscure and unsupported attorney argument.

Unsurprisingly, given that he was at least three degrees removed from the original tipster, Officer O'Neill could not provide any specific information about the informant. (*See* Tr. 14:10–17 (extensively refreshing his recollection by referring to his police report), 15:7–13 (acknowledging that the Scarpa Tip included only basic identifiers, such as the fact the suspect was black, tall, and wore dreadlocks and black jacket), 17:6–16, 57:6–24, 58:23–59:24.) Officer O'Neill acknowledged that, for all he knew, the anonymous tipster could have been anyone: a criminal defendant, an intoxicated individual, or even a jailhouse informant with ulterior motives. (*See* Tr. 17:3–5 ("… [A]nything past that I did not know."), 60:1–20.) At bottom, the Scarpa tipster, whoever he or she is, remains anonymous with the ability to "lie with impunity."[4] *Florida*, 529 U.S. at 275; *cf. United States v. Nelson*, 284 F.3d 472, 484–85 (3d Cir. 2002) (where "the initial tip came from an individual who had a prior relationship with the police force," the officer was "entitled to make an assessment of the situation in light of his specialized training and familiarity").

Second, Officer Sanchez's statement did not offer the types of corroboration that could increase the Scarpa Tip's reliability.[5] Were this Court to rely solely on the police report, its barebones description of the Sanchez Corroboration is essentially worthless. (D.E. 22, Ex. A (Officer Sanchez "did observe a male, whom he recognized as Rodney Joyner.").) The police report only vaguely gestures to the fact that Officer Sanchez may have discussed Defendant's

[4] Even if the individual was a known, reliable informant to Sergeant Scarpa, Officer O'Neill and his squad did not have this information. Thus, it remains unclear how it could have contributed to Officer O'Neill's reasonable suspicion.

[5] In its briefing, the Government offered a secondary argument regarding the utility of the Sanchez Corroboration—that Officer Sanchez knew the Defendant had been held up at the liquor store the week prior, and thus would only have returned to that liquor store if armed. (D.E. 23 at 2, 14.) This explanation was neither testified to on the record at the evidentiary hearing nor present in the police report. (*See* D.E. 26 at 6–7.) As such, it is unsupported attorney argument. Even if this statement were supported by the record, it stretches the imagination to assume that a police officer has a "reasonable" suspicion for frisking an individual every time that individual has been the victim of a crime or assault.

11

physical description, stating that Defendant "match[ed] the exact description." (*Id.*)  Even if the police report had included the information that Officer O'Neill added at the evidentiary hearing, the Sanchez Corroboration only amounts to an acknowledgement that in a predominately black neighborhood, Officer Sanchez had seen a man named Rodney Joyner who was tall, black, wearing black and burgundy,[6] and wearing dreadlocks.  (Tr. 67:22–68:11, 70:22–71:1, 90:16–24); *cf. United States v. Cephas*, 808 F. App'x 122, 124–25 (3d Cir. 2020) (finding evidence that the suspect tried to walk away from the officers and behaved nervously as evidence of a reasonable suspicion for a stop); *United States v. McCants*, 952 F.3d 416, 424 (3d Cir.) (2020) (finding the tipster's "detailed description[s] of the suspect and location" as sufficient to provide indicia of reliability); *Alabama*, 496 U.S. at 327 (finding corroboration in a person's unpredictable movements); *see also Ybarra v. Illinois*, 444 U.S. 85, 93 (1979).  Officer Sanchez did not say that Defendant was "committing a crime," "displaying a weapon," "causing some boisterous event on the street," "screaming, talking loudly, or annoying people," or otherwise "breaking the law in any way, shape, or form."  (Tr. 90:6–20.)  Thus, even combined, the Scarpa Tip and Sanchez Corroboration do not amount to a particularized suspicion for frisking Defendant.

Given the weaknesses in Sergeant Scarpa's tip and Officer Sanchez's corroboration, the Government's argument hinges on the face-to-face Street Tip's reliability.  *United States v. Valentine*, 232 F.3d 350, 354 (3d Cir. 2000) (distinguishing face-to-face informants from truly anonymous tipsters).  The Government argues that this tip meets various *Torres* factors, such as in-person delivery, demeanor, and credibility assessment.  (D.E. 23 at 8); *Unites States v. Johnny*

---

[6] Despite acknowledging that it is important to include all of relevant information in a police report, (Tr. 64:25–65:16), Officer O'Neill stated that he had not included "that Officer Sanchez said the man had a burgundy sweater" in the report, (Tr. 67:7–9).  Even if the omitted information that Mr. Joyner had a burgundy sweater on underneath his black jacket on had been included in the police report, which it was not, this would not amount to a corroboration of the type that suggested Defendant was conducting or contemplating criminal activity.  (Tr. 90:1–91:12.)

*Torres*, 534 F.3d 207, 210–11 (3d Cir. 2008) (listing factors).  The circumstances surrounding the Street Tip, however, may be the most questionable of all.

Officer O'Neill testified that an anonymous tipster approached him and told him that a tall black man with dreads, wearing a black jacket and burgundy sweater, had a gun.  (D.E. 23 at 7–12.)  During their exchange, the anonymous informant did not offer any information regarding his own name, address, relationship with Defendant, or identity in the community.  *See Florida*, 529 U.S. at 276 (Kennedy, J., concurring) (distinguishing truly anonymous tips from those where "the ability of the police to trace the identity of anonymous telephone informants may be a factor which lends reliability"); *cf. Johnny Torres*, 534 F.3d at 211–12 (finding anonymous tip reliable where the tipster, *inter alia*, gave the name of his employer, described his cab, gave a play-by-play of the suspect's actions, explained his first interaction with the suspect, and described the suspect's car).  Further, despite the presence of at least "eight officers" within a stone's throw of each other and the tipster, (Tr. 74:5–17), none of the officers collected any information about the individual, (*id.* 80:12–17 (Q: "[Y]ou could have asked one of the other officers to get his information, couldn't you?" A: "That didn't cross my mind, sir."), 81:7–16 (Q: "You could have quickly asked for his name, right?" A: "I could have asked for his name, but I didn't")).  The tipster then disappeared. (*See* D.E. 22, Ex. A.)

Although the Government suggests that, by presenting himself in person to the officers, the anonymous tipster showed himself as willing to disclose his identity and face the consequences for any untruthful statements, this is not supported by the record.  The tipster nervously gave a short statement and disappeared before any of the eight officers on the scene could gather even a basic physical description of him.  (*See* D.E. 22, Ex. A.)  Nor does the police report provide any information that could speak to his reliability, such as how or why the anonymous tipster became

13

acquainted with Defendant or realized that Defendant had a gun.  (D.E. 22, Ex. A); *United States v. Lopez*, 907 F.3d 471, 480 (7th Cir. 2018) (distinguishing *Adams v. Williams*, 407 U.S. 143, 146 (1972), on the basis that the *Adams* tip came from a reliable informant with a track record of providing accurate information in the past, and the tip relayed that the police officer was in imminent danger because a criminal suspect in a nearby car was armed).  Officer O'Neill could not provide even a general physical description of the anonymous tipster, let alone a name, despite the presence of at least eight police officers observing the scene.  It is true that the law is generous in assessing the reliability of "an in-person tip from a known informant."  *In re S.B.*, 44 A.3d 948, 952 (D.C. 2012).  However, the Government has not provided any case law suggesting that this principle extends to an in-person tip from a nervous,[7] unidentified tipster, who police officers fail to gather any information about prior to the informant disappearing from the scene.[8]  *See Lopez*, 907 F.3d at 481 (granting a motion to suppress where the officers knew the name of an informant, but nothing else regarding his reliability, and stating that "[w]hen officers know the bare identity but little else about an informant, they still must conduct and rely upon independent investigation to corroborate a tip before seizing a person.").

In sum, each of the three statements is missing key information that would allow this Court to conclude that the totality of circumstances amount to a particularized and objective basis for stopping Defendant.  The many discrepancies between the police report and courtroom testimony,

---

[7] Officer O'Neill's testimony that the informant's extreme fearfulness should somehow bolster the tipster's credibility is questionable.  However, even accepting Officer O'Neill's assessment of the situation, given his experience as a street crime officer, the informant's tip falls short of the *Torres* factors for the reasons described above.

[8] Officer O'Neill's testimony that the Street Tip informant relayed to him that the suspect had a handgun tucked into his waistband only further clouds this issue.  (*See* Tr. 75:20–24.)  First, this information was not in the police report.  Second, Officer O'Neill did not testify that he asked the tipster any follow-up questions that would explain how he learned this information.  Third, the undisputed facts suggest that Defendant was seen by the informant on the street, at night, wearing a burgundy sweatshirt layered underneath a black jacket, which would presumably make it hard to see a gun tucked into a waistband.  Together, these facts raise credibility concerns.  A convenient, newly remembered detail—which would have been highly relevant to corroborating the Street Tip, had it been recorded at the time of the event rather than testified to years later—raises concerns regarding hindsight bias and memory.

as well as the video evidence that demonstrates a willingness to stop-and-frisk men of color with abandon, only heighten this Court's concerns. See *United States v. Banks*, Crim. No. 07-552 (D.N.J. April 16, 2008); *see also United States v. Linear*, Crim. No. 08-207, 2008 WL 4615288, at *2 (N.D. Ill. Oct. 14, 2008); *United States v. Banks*, Crim. No. 07-552 (D.N.J. April 16, 2008) (the "officers' credibility [wa]s greatly tarnished" by their failures to include key details in the police report). The police officers, despite being experienced in these types of stops and the constitutional requirements undergirding them, failed to detail the evening's events in an accurate manner in the police report, such that the report would justify a finding of reasonable suspicion.

Based on the factual record and the testimony elicited at the evidentiary hearing, this Court concludes that the officers did not have a reasonable belief, based on specific and articulable facts, to conduct a Terry stop at the liquor store. Because the evidence, including a firearm and ammunition, was discovered during the unlawful Terry stop, the Fourth Amendment requires that the evidence be suppressed. *See United States v. Velasquez*, 626 F.2d 314, 318–19 (3d Cir. 1980). It follows that any statements made by Defendant after the unlawful search and seizure are fruits of the poisonous tree and would likewise be suppressed.[9]

## III.   **CONCLUSION**

For the reasons set forth above, Defendant's Motion to Suppress is **GRANTED**. An appropriate order follows.

s/ *Susan D. Wigenton*
**SUSAN D. WIGENTON**
**UNITED STATES DISTRICT JUDGE**

---

[9] Originally, the parties disputed whether Officer Lowery's questioning of Defendant at the station was appropriate. After an on-record stipulation at the evidentiary hearing, that issue seems to no longer be in dispute. (Tr. 4:9-16, 5:1-6:1.)

Orig:          Clerk
cc:            Parties